# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

NO. 8 MINE, LLC,

        Plaintiff,

      v.

THE ELJEN GROUP, LLC, ELVEN E.
JENNINGS, JACK ELKINS, FRANK
LENTE, AND STEVE HARPER,

        Defendants.

THE ELJEN GROUP, LLC, *et al.*,

        Counter-Plaintiffs,

      v.

NO. 8 MINE, LLC,

        Counter-Defendant.

THE ELJEN GROUP, LLC, *et al.*,

        Third-Party Plaintiffs,

      v.

DAVID TACKETT, ARGENT ASSET
GROUP, LLC, and ROBERT HIGGINS,

        Third-Party Defendants.

Case No.: 3:18-cv-00104-WGC

**Order**

Re: ECF No. 163

Before the court is the Motion for Damages and Other Relief filed by defendants/counter-plaintiffs/third-party plaintiffs The Eljen Group, LLC, Elven E. Jennings, Jack Elkins, Frank Lente and Steve Harper (collectively, the Eljen parties). (ECF Nos. 163-167.) A belated response was filed by plaintiff/counter-defendant No. 8 Mine, LLC and third-party defendant David Tackett (No. 8 Mine/Tackett). (ECF No. 168.) The Eljen parties filed a reply. (ECF No. 171.)

For the reasons set forth below, the motion is granted in large part, and judgment will be entered in favor of the Eljen parties and against No. 8 Mine/Tackett; however, the request that the preliminary injunction continue post-judgment only as to No. 8 Mine and Tackett, and the request for additional injunctive relief are denied.

## I. BACKGROUND

This case involves a dispute surrounding agreements for the purchase of No. 8 turquoise.[1] Plaintiff, No. 8 Mine, LLC, filed suit in state court on February 2, 2018, and the action was subsequently removed to this court. (ECF Nos. 1, 1-1.) The Eljen parties brought counterclaims against No. 8 Mine and third-party claims against No. 8 Mine's sole member, Tackett, as well as third-party claims against Argent Asset Group, LLC, and Robert Higgins. The claims against Argent and Higgins have since been dismissed without prejudice.

No. 8 Mine's/Tackett's second amended complaint/counterclaims alleged that on May 17, 2017, Elkins, Lente and Harper entered into purchase agreement one (PA1) with the Eljen Group and Jennings to purchase approximately 216,000 pounds of No. 8 turquoise for $1,000,000. Elkins, Lente and Harper also entered into purchase agreement two (PA2) with the Eljen Group and Jennings for the sale of approximately 64,000 pounds of No. 8 turquoise for a purchase price of $500,000. Then, on June 8, 2017, No. 8 Mine entered into an assignment agreement with Elkins, Lente and Harper, whereby No. 8 Mine was assigned their rights in PA1 and PA2 with Jennings and the Eljen Group.

No. 8 Mine/Tackett asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, civil conspiracy, intentional interference with

---

[1] No. 8 turquoise refers to turquoise from the No. 8 mine. No. 8 Mine, LLC, on the other hand, is Tackett's LLC, and is the plaintiff and counter-defendant in this case. The court will refer to No. 8 Mine, LLC as No. 8 Mine throughout this Order.

prospective economic advantage, unjust enrichment, fraudulent as well as negligent misrepresentation, and declaratory relief. (ECF No. 107.)

The Eljen parties counterclaims and third-party claims against No. 8 Mine/Tackett include: declaratory and injunctive relief, unjust enrichment, fraud, breach of contract, violation of the injunction in 3:07-cv-230-LRH-RAM[2], conversion, elder abuse, and breach of the promise to deliver silver. They also include alter ego allegations as to No. 8 Mine and Tackett. (ECF No. 112.)

This case was briefly consolidated for limited purposes with case 3:18-cv-00028-WGC, which involves claims by Daniel and Pamella Harrington and their company, Nightwatch Marine, LLC, against Tackett for, among other things, breach of contract related to the sale of 130,000 pounds of turquoise (the Harrington case). (*See* ECF No. 95.)

On August 7, 2019, the parties in this case and the Harrington case stipulated to a preliminary injunction that they would not dispossess any of the No. 8 turquoise or silver bars in dispute in the cases pending further order of the court. (ECF Nos. 104, 105.)

Following the repeated failure of No. 8 Mine and Tackett to respond to various motions and court orders, including an order to show cause, the court issued an order imposing sanctions against No. 8 Mine and Tackett, which included dismissal of No. 8 Mine's/Tackett's second amended complaint and counterclaims, and striking their answer to the Eljen parties' first

---

[2] This refers to an action filed in 2007 by Elven Jennings and his then-partner, Richard Fournier, against Fay Ward and the Ward Family Trust and others concerning a contract for the purchase of No. 8 turquoise from Ward. A permanent injunction was entered by consent in that case whereby certain defendants and others acting in concert with them agreed they would not transact in turquoise from the No. 8 mine. (ECF No. 170 in 3:07-cv-00230-LRH-RAM.)

1  amended counterclaim/third-party complaint.[3] That order discusses in great detail the

2  circumstances leading up to its issuance, and the court need not repeat that history here.

3  (ECF No. 160.) Suffice it to say that the court ordered the Eljen parties to submit a document

4  identifying the counterclaims/third-party claims against No. 8 Mine/Tackett on which they

5  wished to proceed to judgment, and to specify the amount of damages they claim to have

6  suffered as a result, with  supporting explanations and evidence for the amounts. The court

7  permitted No. 8 Mine/Tackett to file a response, and the Eljen parties to file a reply. (*Id.*)

8        On May 22, 2020, the Eljen parties filed this motion for damages and other relief.

9  (ECF Nos. 163-167.) No. 8 Mine/Tackett filed their response, albeit two days late.

10  (ECF No. 168.) The Eljen parties filed a reply. (ECF No. 171.)

11        While the Eljen parties ask the court to strike the untimely response, the court will

12  exercise its discretion to consider No. 8 Mine/Tackett's belated response to the motion.

13                      **II. DISCUSSION**

14  **A. The Allegations are Taken as True**

15        Here, No. 8 Mine's/Tackett's answer to the Eljen parties' first amended

16  counterclaims/third-party claims has been stricken. No. 8 Mine/Tackett never filed a response to

17  the Eljen parties' second amended counterclaims/third-party claims. In addition, No. 8

18  Mine's/Tackett's second amended complaint and counterclaims have also been stricken.

19  (ECF No. 160.) The effect is that No. 8 Mine and Tackett are in default.

20        Other than with respect to the amount of damages, the allegations are deemed admitted.

21  *See* Fed. R. Civ. P. 8(b)(6); *see also Hester v. Vision Airlines, Inc.*, 687 F.3d 1162, 1171 (9th Cir.

22

23

---

[3] No. 8 Mine/Tackett had never filed a response to the Eljen parties' second amended counterclaims/third-party complaint.

2012) (quoting *Alan Neuman Prod., inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988))

("[When a default judgment is entered against a party, that party may appeal the sufficiency of

the Complaint, but 'facts alleged to establish liability are binding upon the defaulting party[.]'").

Therefore, the court's task here is to determine whether those admitted facts result in a

successful legal claim, and if so, the amount of damages. There has been no jury demand in this

case; therefore, it is appropriate for the court to undertake these determinations.

**B. General Facts**

The following general facts, which are now admitted, are relevant to the court's analysis:

Elven Jennings is the sole member of the Eljen Group, LLC, and was 80 years old at the

time of the transactions that are at issue in this litigation. (ECF No. 112 at 13 ¶ 2.)

On May 16, 2017, the Eljen Group/Jennings entered into two purchase agreements to sell

No. 8 turquoise to Elkins, Lente, and Harper: PA1 and PA2. PA1 was for the sale of

approximately 216,000 pounds of turquoise located in a warehouse in Sparks, Nevada, and a

small amount at Jennings' home, for the price of $1,000,000. (PA1 at ECF No. 164-1; Jennings

Decl., ECF No. 164 ¶ 2.) PA2 was for the sale of approximately 64,000 pounds of turquoise

located in a warehouse in Winnemucca, Nevada, for the price of $500,000. (PA2 at ECF No.

164-2; Jennings Decl., ECF No. 164 ¶ 2.) The purchase price was to be paid by Elkins, Lente and

Harper, through monthly installment payments, and payments were made for May and June of

2017, totaling approximately $20,000. (Jennings Decl., ECF No. 164 ¶ 3.)

On June 8, 2017, No. 8 Mine entered into an assignment agreement with Elkins, Lente

and Harper, where No. 8 Mine was assigned their rights to purchase the turquoise from the Eljen

Group/Jennings that is the subject of PA1 and PA2, in exchange for payment of $1,000,000 to

Elkins, Lente and Harper, pursuant to a promissory note. (ECF No. 164-3.) Tackett, as manager

of No. 8 Mine, LLC, signed a promissory note whereby No. 8 Mine promised to pay Elkins, Lente, and Harper $1,000,000, with a maturity date of June 8, 2019, with a right to pre-pay the amount due. (ECF No. 164-5.)

Tackett is the sole member of No. 8 Mine, LLC. (ECF No. 112 at 13 ¶ 6.)

On June 16, 2017, No. 8 Mine entered into an agreement with the Eljen Group/Jennings whereby No. 8 Mine agreed to purchase the turquoise that was the subject of PA1 and PA2 for the price of $1,500,000, payable in cash or its equivalent at closing . (ECF No. 164-4; Jennings Decl., ECF No. 164 ¶¶ 4, 8.) That day, Tackett told Jennings words to the effect that he "could write a check right now for the whole amount." (Jennings Decl., ECF No. 164 ¶ 9.) Tackett agreed to meet Jennings at his bank that afternoon to complete a wire transfer for payment. (*Id.* ¶ 12.)[4] Tackett did not arrive to the bank until shortly before it closed, and said he had documents that had to be notarized and then he would make the payment; however, by the time they found a notary, the bank had closed. (*Id.* ¶¶ 12-14.) In the next few days, No. 8 Mine/Tackett loaded the PA1 turquoise from the Sparks warehouse and a small amount from Jennings' home onto several trailers, including one trailer that was owned by Jennings that Jennings allowed Tackett to use. (*Id.* ¶ 10.) Tackett had the turquoise taken to a storage facility in Flagstaff, Arizona. (Tackett Depo., ECF No. 166-4 at 3.) No. 8 Mine/Tackett did not make any payments when it took possession of the PA1 turquoise. (Jennings Decl., ECF No. 164 ¶ 15.)

Tackett subsequently tried to convince Jennings to take payment in an annuity, but Jennings rejected this proposal. Then, on June 18, 2017, Tackett suggested that Jennings take payment in bars of silver. (*Id.* ¶ 16.) The following day, on June 19, 2017, Jennings signed a

---

[4] The declaration lists the date as June 16, 2019; however, the court presumes this is a typo because all the surrounding dates are in June 2017.

handwritten document prepared by Tackett that Jennings would be paid with 550 one hundred ounce bars of silver, with a value of $980,650 to be applied toward the purchase price of the PA1 turquoise. (*Id. ¶* 18; ECF No. 164-7.*)* This was calculated based on the value of the turquoise that had been taken from the Sparks warehouse and from Jennings' home, less the amount that Elkins and Harper had already paid. It did not account for the remaining PA2 turquoise stored in Winnemucca, Nevada. (Jennings Decl., ECF No. 164 ¶ 19.)

On June 19, 2017, Tackett paid Lente $110,000, Elkins $120,000, and Harper $110,000. (ECF No. 107 at 8 ¶ 32; ECF No. 164-6)

On July 4, 2017, Tackett texted Jennings that No. 8 Mine sent payment on June 21, 2017, for $980,000 and on June 22, 2017, for $200,000, for bars of silver. (Jennings Decl., ECF No. 164 ¶ 22; ECF No. 164-10.)

On July 12, 2017, Tackett presented Jennings with a "closing agreement and acknowledgement form" and said that if Jennings did not sign it he would not get paid. The document said that upon payment of the purchase price of $1,500,000 by wire transfer, the purchase price would be deemed paid in full; however, the bank and account number listed on the form did not belong to Jennings. (*Id*. ¶¶ 23-24.)

On August 30, 2017, Tackett called Jennings and proposed that Jennings "carry the paperwork" on a house from which Jennings would be paid monthly payments. Jennings was concerned he had not been paid, and told Tackett to send him the paperwork and he would look it over. Jennings also sent Tackett a text and said checks for the deal should be made to the Eljen Group, LLC. (*Id*. ¶ 27.) Tackett did not send anything about the house, or tell Jennings that he was using funds that were supposed to be used to buy the silver in order to buy the house. (*Id*. ¶ 29.)

Jennings made repeated demands on Tackett for delivery of the silver bars, and Tackett made promises to deliver but never delivered the entire amount due. Tackett said at the time of one partial delivery that the rest of the silver bars were in another safe but the person with the combination to that safe had not come to work that day. On another occasion, Jennings saw that Tackett had additional silver bars in his safe, but Tackett said they were for another customer. (*Id.* ¶ 32.)

Tackett made the following payments to Jennings:

| Mode of Payment | Value | Date |
|---|---|---|
| $64,500 | $64,500 | July 19, 2017 |
| 55 100 oz silver bars | $98,065 | July 19, 2017 |
| 20 gold krugerrands | $26,200 | July 19, 2017 |
| 181 100 oz silver bars | $322,723 | October 28, 2017 |
| 45 100 oz silver bars | $80,235 | December 30, 2017 |

**Total:** $591,723

(*Id.* ¶ 33.)

In October of 2017, Jennings met with Elkins, Harper, and Lente, and expressed frustration regarding No. 8 Mine's promises to pay and failure to follow through, and they determined that in light of the failure to timely pay that the turquoise and rights subject to PA2 reverted to them. (ECF No. 112 at 17 ¶ 40.)  Elkins, Harper and Lente agreed to help him minimize his losses by entering into a renewed agreement concerning the PA2 turquoise stored in Winnemucca. This agreement is referred to as purchase agreement three (PA3). (Jennings Decl., ECF No. 164 ¶ 34; PA3 at ECF No. 166-1.)

On December 30, 2017, Tackett delivered a handwritten note to Jennings that he would pay $10,000 per month until he had paid in full on the original deal of $1,500,000 for the turquoise, and would give an extra $200,000 (paid in monthly installments of $2,000). (ECF No. 166-3.) Jennings did not accept this proposal. (Jennings Decl., ECF No. 164 ¶ 36.)

Between January 1 and 4, 2018, Elkins, Lente and Harper transferred the turquoise subject to PA2 from Winnemucca, Nevada, to New Mexico. (ECF No. 112 at 17 ¶ 41.) On January 15, 2018, Lente sold his rights in the No. 8 turquoise transactions to Elkins and Harper, in purchase agreement 4 (PA4). (ECF No. 167-3.)

No. 8 Mine/Tackett never paid anything for the PA2 turquoise. (*Id.* ¶ 37.) In addition, Jennings' trailer  has not been returned, nor has No. 8 Mine/Tackett paid Jennings for the trailer, which is worth $11,000. (*Id.* ¶ 38; Jennings' title to trailer at ECF No. 166-2.)

**C. Alter Ego**

The court will first address the Eljen parties' request for a finding that Tackett is the alter ego of No. 8 Mine such that joint and several liability is appropriate. No. 8 Mine/Tackett presented no argument in response to the Eljen parties' alter ego position.

"Nevada has long recognized that although corporations are generally to be treated as separate legal entities, the equitable remedy of 'piercing the corporate veil' may be available to a plaintiff in circumstances where it appears that the corporation is acting as the alter ego of a controlling individual." *LFC Mktg. Group, Inc. v. Loomis*, 8 P.3d 841, 845, 116 Nev. 896, 902 (2000) (citation omitted). "[T]he 'essence' of the alter ego doctrine is to 'do justice' whenever it appears that the protections provided by the corporate form are being abused." *Id.* (citation omitted).

In Nevada, the alter ego doctrine is codified for corporations in Nevada Revised Statute (NRS) 78.747. The Nevada Supreme Court has held that it also applies to limited liability companies. *Gardner on Behalf of L.G. v. Eighth Jud. Dist. Ct.,* 405 P.3d 651, 656, 133 Nev. 730, 736 (2017). Under the statute, a person acts as the alter ego of the entity if: the entity "is influenced and governed by the person"; "[t]here is such unity of interest and ownership that the corporation and the person are inseparable from each other"; and "[a]dherence to the notion of the corporation being an entity separate from the person would sanction fraud or promote manifest injustice." NRS 78.747(2). This determination is made as a matter of law. NRS 78.747(3).

It should be noted that "[t]he corporate cloak is not lightly thrown aside and that the alter ego doctrine is an exception to the general rule recognizing corporate independence." *LFC Mktg.*, 8 P.3d at 846, 116 Nev. at 903-04 (citation and quotation marks omitted). Alter ego must be established by a preponderance of the evidence. *Id.* "[T]he following factors, though not conclusive, may indicate the existence of an alter ego relationship: (1) commingling funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to observe corporate formalities." *Id.* (citation omitted). There is "no litmus test for determining when the corporate fiction should be disregarded; the result depends on the circumstances of each case." *Id.* (citation and quotation marks omitted).

The following facts from the Second Amended Counterclaims/Third-Party Claims are taken as true: Tackett treats and refers to himself as No. 8 Mine interchangeably in business transactions; Tackett and No. 8 Mine commingle assets and financial accounts, and transfer money without corresponding documentation or formality; Tackett and No. 8 Mine enter, amend and implement contracts interchangeably; No. 8 Mine is structured such that it is substantially

undercapitalized in an effort to avoid obligations and liabilities to creditors; Tackett and No. 8

Mine have abused and failed to observe legally mandated formalities associated with the

formation and operation of a limited liability company; Tackett and No. 8 Mine have structured

transactions for improper purposes of allowing money to be laundered through business entities,

avoiding payment of taxes legally due, and improperly hiding money and assets from creditors.

(ECF No. 112 at 29-30.)

In addition, the Eljen parties present the following undisputed evidence to support their

alter ego claim:

Tackett disregarded No. 8 Mine as the party to the silver payment transaction and

converted for his personal use $230,000 to buy a house in Florida, when that money was

supposed to be applied to No. 8 Mine's obligation to Jennings. (ECF No. 167-4; ECF No. 166-6.)

Tackett took receipt of 181 100 ounce silver bars worth over $300,000, that were to be

applied to No. 8 Mine's obligation to Jennings, but instead Tackett sold those bars of silver to

third parties and retained the proceeds. (ECF No. 166-4 at 6-7.)

Tackett is the sole member and manager of No. 8 Mine. (ECF No. 166-4 at 16:11-15.) He

is the only employee of No. 8 Mine. (ECF No. 166-4 at 16:16-18.) No. 8 Mine's only business

dealing, and only asset, relates to the No. 8 turquoise purchased from Jennings. (ECF No. 166-4

at 4:22-25) No. 8 Mine does not maintain a bank account; has not filed a tax return; and

maintains no business records. (ECF No. 166-4 at 11:5-14.)

Tackett purported to enter into a joint venture to market the No. 8 turquoise, treating the

No. 8 turquoise as personal property, rather than property of No. 8 Mine. (Ex Z; ECF No. 166-4

at 11-12, 15.) Tackett did not differentiate expenses attributable to No. 8 Mine from those

attributable to the joint venture. (ECF No. 166-4 at 12:19-22.)

Despite purportedly taking assignment of the 2009 injunction in the name of No. 8 Mine, Tackett represented to the Harringtons that he individually owned rights to the 2009 injunction. (ECF No. 167-2 at 4-5.)

In dealings with Jennings, Tackett referred to himself and No. 8 Mine without making a distinction. For instance, in his handwritten note dated December 30, 2017, he said that he, David Tackett, would pay Jennings, even though the initial agreement had been with No. 8 Mine. (ECF No. 166-3.)

Finally, No. 8 Mine and Tackett refer to themselves as a unified entity in their Second Amended Complaint. (ECF No. 107.)

These undisputed facts demonstrate by a preponderance of the evidence that the corporate veil should be pierced. First, the facts above establish that Tackett influenced and governed No. 8 Mine as Tackett was the only member and manager of No. Mine, as well as its sole employee.

Second, there was also a unity of interest and ownership between the two. Their own pleadings refer to them interchangeably. Agreements were entered into on behalf of No. 8 Mine, only to have Tackett modify or attempt to modify them in his own name. Tackett's communications do not differentiate between the entity and the individual. Moreover, while the agreement for the turquoise that purported to give rights to the injunction in 3:07-cv-00230-LRH-RAM was entered into by No. 8 Mine, Tackett represented to the Harringtons that *he* owned the rights to the injunction. Corporate formalities were not adhered to, and No. 9 Mine did not have a bank account, did not file a tax return, and did not keep records. As No. 8 Mine had no bank account, and its only asset was the turquoise that it did not fully pay for, it appears it is undercapitalized. In addition, the evidence suggests that Tackett took funds that were supposed

to be applied to the balance owed to the Eljen Group/Jennings by No. 8 Mine and instead utilized them for personal purposes (i.e., a house in Florida, and the sale of silver bars to third parties).

Finally, adherence to the corporate fiction of a separate legal entity would sanction a fraud because Tackett could use No. 8 Mine to shield his assets from a substantial judgment while depleting any assets of No. 8 Mine (*i.e.*, the turquoise).

Therefore, the court finds that Tackett is the alter ego of No. 8 Mine.

**D. The Eljen Group/Jennings**

Jennings and the Eljen Group, LLC, seek judgment awarding damages on Counts II (unjust enrichment), III (fraud), VI (conversion), and VIII (breach of promise to deliver silver), related to No. 8 Mine/Tackett's possession of the turquoise subject to PA 1. Jennings also seeks double damages for elder abuse in Count VII.

**1. Count II-Unjust Enrichment**

It is alleged that Tackett/No. 8 Mine have been unjustly enriched in relation to possession of the turquoise that is the subject of PA1, and the Eljen Group/Jennings seek damages for the amount of this unjust enrichment.[5]

No. 8 Mine/Tackett argue that the Eljen parties did not sufficiently plead the elements of unjust enrichment.

The Eljen parties apply Nevada law, and No. 8 Mine/Tackett have not argued that any other law applies; therefore, the court will apply Nevada law here. In Nevada, "[u]njust

---

[5] The Eljen Group/Jennings appear to have abandoned the claim that Tackett/No. 8 Mine were unjustly enriched in relation to possession of turquoise subject to the injunction in case 3:07-cv-00230-LRH-RAM; and instead, they argue that are entitled to a declaration that any rights to the injunction in 3:07-cv-00230-LRH-RAM are null and void and the rights are vested in the Eljen parties. The latter request will be discussed, *infra*.

1  enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or

2  property of another against the fundamental principles of justice or equity and good conscience."

3  *Topaz Mut. Co., Inc. v. Marsh*, 839 P.2d 606, 613, 108 Nev. 845, 856 (1992) (citation and

4  quotation marks omitted). The essential elements of a claim for unjust enrichment are: (1) "a

5  benefit conferred on the defendant by the plaintiff"; (2) "appreciation by the defendant of such a

6  benefit"; and (3) "acceptance and retention by the defendant of such a benefit under

7  circumstances such that it would be inequitable for him to retain the benefit without payment of

8  the value thereof." *Unionamerica Mortg. & Equity Trust. v. McDonald*, 626 P.2d 1272, 1273, 97

9  Nev. 210, 212 (1982) (citation and quotation marks omitted). In other words, "[u]njust

10  enrichment occurs whenever a person has and retains a benefit which in equity and good

11  conscience belongs to another." *Id*. (citation omitted).

12       The Eljen Group/Jennings' pleading clearly alleges that Tackett/No. 8 Mine were unjustly

13  enriched: they claim that Tackett/No. 8 Mine took possession of the No. 8 turquoise that was the

14  subject of PA1 without fully paying for it, and retained the turquoise.

15       The court rejects No. 8 Mine/Tackett's argument that the claim is not sufficiently plead.

16  In addition, the court finds that the Eljen Group/Jennings have produced sufficient evidence to

17  support their claim of unjust enrichment.

18       "In a case with a quantum meruit or unjust enrichment theory of recovery, the proper

19  measure of damages is the 'reasonable value of [the] services'" or the benefit conveyed. *Asphalt*

20  *Prod. Corp. v. All Star Ready Mix, Inc.*, 898 P.2d 699, 701, 111 Nev. 799, 802  (1995) (quoting

21  *Flamingo Realty, Inc. v. Midwest Dev., Inc.,* 110 Nev. 984, 879 P.2d 69, 71 (1994)).

22       No. 8 Mine/Tackett do not dispute the amount that the Eljen Group/Jennings claim to

23  have been damaged as a result of the unjust enrichment: $408,277, which is calculated by taking

14

the agreed upon value of the turquoise subject to PA of $1,000,000, and subtracting what was paid by No. 8 Mine/Tackett as well as the payments made by Lente and Harper. In addition, the Eljen Group/Jennings are entitled to return of Jennings' trailer, or $11,000, as No. 8 Mine/Tackett have not disputed that they retained the trailer. Nor have they contested the asserted value of the trailer. Therefore, judgment will be entered in favor of the Eljen Group/Jennings and against No. 8 Mine/Tackett on the unjust enrichment claim.

### 2. Count III-Fraud

To establish a claim of fraud in Nevada, the plaintiff must demonstrate the following elements: (1) the defendant made a false representation; (2) with knowledge or belief that the representation was false (or knowledge there was an insufficient basis for making the representation); (3) with the intention of inducing the party to act or refrain from acting upon the misrepresentation; (4) the plaintiff justifiably relied on the misrepresentation; and (5) the plaintiff suffered damage as a result of the reliance. *J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89P.3d 1009, 1018, 120 Nev. 277, 290 (2004); *Blanchard v. Blanchard*, 839 P.2d 1320, 1322, 108 Nev. 908, 911 (1992) (citation omitted). "Fraud is never presumed; it must be clearly and satisfactorily proved." *J.A. Jones,* 89 P.3d at 1018 (citation and quotation marks omitted). In alleging fraud "a party must state with particularity the circumstances constituting fraud[.]" Nev. R. Civ. P. 9(b).

With respect to the fraud claim, No. 8 Mine/Tackett only argue that the Eljen Group/Jennings did not sufficiently plead the elements of fraud.

The second amended counter-claims/third-party claims allege that Tackett misrepresented that No. 8 Mine was an existing limited liability company. (ECF No. 112 ¶ 61.) Tackett further represented between May 2017 and early June 2017, that he had money available to pay Jennings

in full. (*Id.* ¶ 62.)  On June 16, 2017, Tackett told Jennings he would make payment through a wire transfer, causing Jennings to open a bank account on behalf of the Eljen Group for the purpose of receiving the wire; however, Tackett then stalled to avoid timely meeting with Jennings and did not arrive at the bank until right before it closed. (*Id.* ¶¶ 63, 64.*)* Tackett misrepresented to Jennings that the bank made an error and he could not complete the wire. (*Id.* ¶ 66.) At the time he represented he would wire the funds, Tackett did not have $1,000,000 to pay for the turquoise subject to PA1. (*Id.* ¶ 67.)

After taking delivery of the PA1 turquoise, but without paying for it, Tackett then misrepresented to Jennings that he acquired on Jennings' behalf bars of silver which would be delivered to Jennings in lieu of cash payment, and that they would be delivered by Argent Asset Group, LLC, a company owned by Robert Higgins. (ECF No. 112 at 15 ¶¶ 26-27, 68-69.) On June 19, 2017, Tackett contacted Argent Asset Group, and locked in the purchase price for 550 bars of silver, which were to be applied to pay Jennings for the turquoise subject to PA1. (*Id.* ¶ 72.) Tackett arranged for Argent to deliver the bars of silver to Tackett. (*Id.* ¶ 73.) Tackett, working with Higgins, engaged in a fraudulent scheme whereby they generated documents reflecting fraudulent wire transfers to create a false paper trail that Tackett purchased silver bars on behalf of Jennings. (*Id.* ¶ 28.) Tackett misrepresented by omission that he structured the turquoise for silver exchange such that Tackett would skim approximately $57,100 off the transaction. (*Id.* ¶ 71.)

On September 1, 2017, Tackett and Argent structured a transaction whereby Argent wired $230,000 to Tackett to purchase a house for Tackett in Florida, but the $230,000 was part of the funds that had been wired to Argent to be applied to the turquoise purchase price owed to Jennings. (*Id.* ¶ 82.) On September 30, 2017, Tackett sent Higgins a text stating: "I need to be

clear. I have not delivered on my end the way I told my customer I would…" (*Id.* ¶ 83.) At that time, Tackett did not possess silver bars sufficient to satisfy the balance owed to Jennings. (*Id.* ¶ 85.)

On September 30, 2017, Tackett sent Jennings a text: "pick a date to meet me and let me pay in full and pick up the rest of the rock I'll meet you in winimucka [sic] to do so." (*Id.* ¶ 86.) The text was designed to induce Jennings into releasing possession of turquoise then stored in Winnemucca. (*Id.* ¶ 87.) On October 2, 2017, Tackett sent a text to Jennings: "I Have all the stuff now, the last bar cam [sic] in while I was in Hawaii last week." (*Id.* ¶ 88.) This was false, and there were no silver bars received by Tackett the week before October 2, 2017. (*Id.* ¶¶ 89-90.) This was designed to deceive Jennings to release the turquoise in Winnemucca, even though Tackett lacked the ability to pay for the turquoise. (*Id.* ¶ 90.) The Eljen Party/Jennings suffered damage as a result of No. 8 Mine/Tackett's actions. (*Id.* ¶ 91.)

Between July 19, 2017 and December 30, 2018, No. 8 Mine/Tackett delivered some silver bars and other forms of payment, but never paid in full the PA1 purchase price. (*Id.* ¶¶ 32, 34, 35.) Tackett also represented to Jennings on December 30, 2017, that he would pay $10,000 per month until Jennings was paid in full on the turquoise, and would pay an extra $200,000 (at $2,000 per month) until Jennings was paid, or when half the turquoise was sold, whichever was sooner. (*Id.* ¶ 36.) Tackett never made the promised payments. (*Id.* ¶ 37.)

Preliminarily, the Eljen Group/Jennings' pleading sufficiently asserts a claim for fraud. It alleges very specifically the false representations made by Tackett: that he had the ability to pay Jennings right away by wire, when he in fact did not; that he would pay Jennings in full with silver bars; and, later, that he would make payments to Jennings to pay the full purchase price, plus additional amounts for the delay, which he never did. The pleading further alleges that

Tackett knew the representations were false, and that he made the representations to induce the Eljen Group/Jennings to allow him to possess the turquoise without paying in full. Finally, it is sufficiently alleged that the Eljen Group/Jennings were damaged because they were dispossessed of the turquoise without being paid in full.

With these allegations deemed admitted, the Eljen Group/Jennings have sufficiently demonstrated their claim of fraud. They seek the same damages under the fraud claim as they seek for the unjust enrichment claim. Judgment will be entered in favor of the Eljen Group/Jennings and against No. 8 Mine/Tackett on the fraud claim.

**3. Count VI-Conversion**

It is alleged that the counter-plaintiffs have the right to ownership and possession of the turquoise subject to PA1, and Tackett/No. 8 Mine substantially interfered with those rights by wrongfully possessing, selling, marketing and others acting with respect to the turquoise. It is further alleged that No. 8 Mine and Tackett refused to return the converted turquoise upon demand.

The conversion claim also contains allegations regarding turquoise subject to the injunction in case 3:07-cv-00230-LRH-RAM. The Eljen Group/Jennings appear to have abandoned that aspect of the conversion claim, and instead argue for declaratory relief that any rights No. 8 Mine/Tackett claim to have had in that injunction revert to them, which will be addressed, *infra*.

No. 8 Mine/Tackett argue that the claim is based on an incorrect reading of the injunction in case 3:07-cv-00230-LRH-RAM, which enjoins certain parties to the case from performing certain actions, and No. 8 Mine/Tackett were not those parties. This argument is misplaced as the

conversion claim is also focused on the wrongful possession or interference with the turquoise that is the subject of PA1, which is at issue in this motion.

In Nevada, conversion is "a distinct act of dominion wrongfully extended over another's personal property in denial of, or inconsistent with his title or rights thereon or in derogation, exclusion or defiance of such title or rights." *Wantz v. Redfield*, 326 P.2d 413, 414, 74 Nev. 196, 198 (1958) (quoting 53 Am. Jur. 819).

"[T]he full value of the property at the time of conversion is an appropriate measure of damages when the defendant is unable or unwilling to return the property." *Winchell v. Schiff*, 193 P.3d 946, 951, 124 Nev. 938, 945 (2008) (citing *Bader v. Cerri*, 609 P.2d 314, 317, 96 Nev. 352, 356 (1980), *overruled on other grounds by Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1048, 116 Nev. 598, 606 (2000)).

To the extent No. 8 Mine/Tackett kept possession of turquoise subject to PA1 that they did not pay for, the Eljen Group/Jennings have sufficiently demonstrated the elements of the conversion claim. Again, the Eljen Group/Jennings seek the same damages under the conversion claim as under the unjust enrichment and fraud claims. Judgment will be entered in favor of the Eljen Group/Jennings and against No. 8 Mine/Tackett on the conversion claim.

### 4. Count VIII-Breach of Promise to Deliver Silver

It is alleged that Tackett and No. 8 mine agreed to pay Jennings for the turquoise subject to PA1 and PA2 by delivery of bars of silver, selecting Argent Asset Group, LLC, to supply the silver to satisfy the payment obligations to Jennings. On  June 16, 2017, Tackett/No. 8 Mine represented to Jennings that Tackett made arrangements with a reliable silver supplier to deliver the silver within 30 days. To the extent Argent Asset Group, LLC delivered silver to satisfy No. 8 Mine/Tackett's obligation to Jennings, it was delivered to Tackett, and not to Jennings.

No. 8 Mine/Tackett argue that this claim fails as it does not comply with the statute of frauds, NRS 104.2201, which requires that a contract for the sale of goods for $500 or more be in writing to be enforceable. They contend that there is no allegation of a writing, and thus the claim is not well-plead.

The Eljen Group/Jennings counter that No. 8 Mine/Tackett failed to plead the statute of frauds as an affirmative defense, and therefore, it is waived. In any event, they contend that the promise to pay in silver bars for the PA1 turquoise was in fact reduced to a writing signed by Tackett.

The Eljen Group/Jennings are correct that there is a writing reflecting an agreement between Jennings and Tackett for payment for the PA1 turquoise to be made via 550 100 ounce bars of silver worth $980,650. (ECF No. 164-7.) Furthermore, as the Eljen Group/Jennings point out, No. 8 Mine/Tackett admitted there was an agreement that payment for the turquoise would be made with bars of silver. (ECF No. 107 ¶ 31.)

"Under Nevada law, 'the plaintiff in a breach of contract action [must] show (1) the existence of a valid contract, (2) a breach by the defendant, (3) and damage as a result of the breach.'" *Rivera v. Peri & Sons Farms, Inc.,* 735 F.3d 892, 899 (9th Cir. 2013) (quoting *Saini v. Int'l Game Tech.,* 434 F.Supp.2d 913, 919-20 (D. Nev. 2006)).

There is no dispute that there was an agreement[6] to pay for the PA1 turquoise with bars of silver, and that Tackett breached that agreement when he failed to pay in full for the turquoise with the silver bars as agreed. *See* NRS 104.2507 (tender of the goods by seller entitles the seller

---

[6] "An agreement modifying a contract within this Article (the Uniform Commercial Code) needs no consideration to be binding." NRS 104.2209(1); *see also Clark County Sports Ent, Inc. v. City of Las Vegas,* 606 P.2d 171, 175, 96 Nev. 167, 172 (1980) (citing *Holland v. Crummer Corp.*, 368 P.3d 63, 66, 78 Nev. 1, 7 (1962)) ("Parties may mutually consent to enter into a valid agreement to modify a former contract.").

1   to payment according to the contract); NRS 104.2607(1) ("The buyer must pay at the contract

2   rate for any goods accepted."). Therefore, the Eljen Group/Jennings have sufficiently

3   demonstrated a breach of the promise to pay with silver bars.

4       The Eljen Group/Jennings seek the same amount of damages in this claim as they do in

5   the unjust enrichment, fraud, and conversion claims. When a seller fails to make payment on or

6   before delivery of the goods, the seller's remedies include recovery of the price of the goods

7   accepted, plus incidental damages. NRS 104.2709(1)(a); NRS 104.2710.

8       Therefore, judgment will be entered in favor of the Eljen Group/Jennings and against No.

9   8 Mine/Tackett on the breach of promise to deliver silver claim.

10       **5. Damages on Counts II, III, VI, and VIII**

11       The Eljen Group/Jennings seek the following relief on Counts II, III, VI, and VIII:

12   (1) $408,277 for the unpaid portion of the PA1 turquoise (calculated by subtracting the amount

13   paid ($591,721) from the purchase price of $1,000,000);

14   (2) Return of the trailer used by No. 8 Mine to transport the PA1 turquoise under NRS 17.120(1),

15   or damages in the amount of $11,000 if it cannot be returned.

16       No. 8 Mine/Tackett do not dispute the amount of damages sought by the Eljen

17   Group/Jennings in connection with these claims; therefore, it is appropriate to enter judgment in

18   favor of the Eljen Parties/Jennings and against No. 8 Mine/Tackett accordingly.

19       **6. Count VII**

20       Jennings argues that NRS 41.1395 is designed to protect vulnerable persons, including

21   older persons, from loss of money or property by exploitation. Jennings was 80 at the time of the

22   transaction, and meets the definition of an "older person." Jennings contends that through a series

23   of deceptive acts, No. 8 Mine and Tackett obtained control of the PA1 turquoise and Jennings'

trailer with the intent to permanently deny Jennings of possession of the property without paying

for it. No. 8 Mine/Tackett took possession of the turquoise without paying for it at time of

delivery, and then restructured the form of payment and repeatedly promised to pay and

professed an ability to pay, but never followed through, diverting funds that were supposed to be

used to complete payment to Jennings.

Jennings seeks to recover double damages under NRS 41.1395, and as such seeks an

additional $419,277 (which is comprised of the $408,277 still owed on the PA1 turquoise and the

$11,000 for the trailer).

No. 8 Mine/Tackett make no argument with respect to the elder law claim.

NRS 41.1395 provides that "if an older person … suffers a loss of money or property

caused by exploitation, the person who caused the … loss is liable to the older person … for two

times the actual damages incurred by the older person[.]" NRS 41.1395(1).

An "older person" is anyone 60 or older. NRS 41.1395(4)(d). "Exploitation" is defined

as:

> any act taken by a person who has the trust and confidence of an
> older person … to: (1) Obtain control, through deception,
> intimidation or undue influence, over the money, assets or property
> of the older person or vulnerable person with the intention of
> permanently depriving the older person or vulnerable person of the
> ownership, use, benefit or possession of that person's money,
> assets or property; or
>
> (2) Convert money, assets or property of the older person with the
> intention of permanently depriving the older person or vulnerable
> person of the ownership, use, benefit or possession of that person's
> money, assets or property.

NRS 41.1395(4)(b).

It is admitted that Jennings was 80 years old during the relevant time period, and was

therefore over the age of 60 and considered an older person under the statute. (ECF No. 112 ¶ 2.)

It is further admitted that Tackett established a relationship of trust and confidence with Jennings, including assumption and control over the transaction with Argent Asset Group, LLC, to obtain payment of the amounts due to Jennings. (*Id.* ¶ 112.) The question is whether the remaining admitted facts demonstrate that Tackett used deception, intimidation or undue influence to gain control of the PA1 turquoise, with the intent to permanently deprive Jennings of the PA1 turquoise.

First, Tackett told Jennings he could pay for the turquoise by using a wire, and that he could do so that day. (ECF No. 112 ¶¶ 63-64.) Based on this, Jennings went to the bank to meet Tackett for the wire, but Tackett did not show up to the bank until right before it closed, and said that the bank made an error and could not complete the wire, but in reality he did not have the funds to pay for the turquoise. (*Id.* ¶¶ 65-67.) Then, Tackett tried to get Jennings to accept an annuity as payment for the turquoise. (*Id.* ¶ 68.) When Jennings would not accept that proposal, Tackett convinced Jennings to accept payment in silver bars. (*Id.*) He indicated he would deliver the silver bars, and that he had paid for the silver bars from Argent Asset Group, LLC. (*Id.* ¶¶ 69, 72-73.) Then, when he did not deliver on the promise to pay in full through silver bars, Tackett made another promise to pay Jennings $10,000 a month until he was paid in full, and would give him an extra $200,000, paid in $2,000 monthly installments to make up for the delay in payment. (*Id.* ¶ 36.) Tackett continued to engage in the deceptive tactic of proposing yet another mechanism for payment, but Tackett never fully followed through on any of these promises. Instead, he convinced Jennings to allow him to use Jennings' trailer to assist in transporting the PA1 turquoise to his storage facility in Arizona, and Tackett still possesses the PA1 turquoise and has not returned Jennings' trailer. (*Id.* ¶¶ 37-39, 81, 83-84, 90.)

In addition, after a meeting in October of 2017 where Jennings demanded the bars of silver, Tackett planted a gun under the seat of Jennings' vehicle, with the intent to report Jennings to law enforcement. When he was caught planting the gun, Tackett said it was "just a joke." (*Id*. ¶ 113.) Also in October 2017, Tackett attempted to set Jennings up by giving him a sealed envelope while in front of security cameras at the bank, and then demanding return of the envelope a short time later outside the view of the cameras, with the intent of creating a false record of payment. (*Id*. ¶ 14.)

In sum, the court finds that it has been sufficiently demonstrated that Tackett established a relationship of trust and confidence with Jennings, an older person under the statute, and Tackett used deception and intimidation to gain control of the PA1 turquoise, with the intent to permanently deprive Jennings of the PA1 turquoise. Therefore, judgment should be entered in favor of Jennings and against Tackett/No. 8 Mine on the elder law claim, and Jennings is entitled to recover double damages, for an additional $419,277.

**7. Interest**

Jennings and the Eljen Group seek an award of prejudgment interest from the date No. 8 Mine's obligation became due on June 19, 2017, through May 15, 2020, in the amount of $67,986.29, plus interest thereafter until judgment at a daily rate of $64.32, on the unpaid balance due of $408,277 related to PA1. They do not seek interest on the double damages recoverable under the Nevada Elder Abuse statute.

No. 8 Mine/Tackett provide no argument in response to the request for prejudgment interest.

This action is in federal court based on the court's diversity jurisdiction therefore, Nevada's prejudgment interest rules and rates apply. *See In re Exxon Valdez,* 484 F.3d 1098,

24

1101 (9th Cir. 2007) (citations omitted). To make an award of prejudgment interest, the court

must determine: "(1) the rate of interest; (2) the time when it commences to run; and (3) the

amount of money to which the rate of interest must be applied." *Kerala Properties, Inc. v.*

*Familian*, 137 P.3d 1146, 1148-49, 122 Nev. 601, 604 (Nev. 2006) (citation and quotation marks

omitted).

The Eljen Group/Jennings note the date of the agreement entered into between the Eljen

Group/Jennings and No. 8 Mine was June 16,2017, and state that the obligation became due on

June 19, 2017, when No. 8 Mine/Tackett took possession of the turquoise. (ECF No. 163 at

11:12-14, 19-20.) The agreement to pay in bars of silver is also dated June 19, 2017. (ECF No.

164-7.)

This case is based at least in part on the breach of the agreement to deliver the silver bars.

For contracts, other than book accounts, "[i]n the absence of an agreed term in a contract

fixing a different rate of interest, the rate of prejudgment interest is "the prime rate at the largest

bank in Nevada, as ascertained by the Commissioner of Financial Institutions, on January 1, or

July 1, as the case many be, immediately proceeding the date of the transaction, plus 2 percent,

upon all money from the time it becomes due…" *See* Nev. Rev. Stat. 99.040(1). Nevada courts

have applied NRS 99.040 to calculate prejudgment interest in contract actions  "when the amount

is due on an ascertainable date." *State Drywall, Inc. v. Rhodes Design & Dev.*, 127 P.3d 1082,

1086, 122 Nev. 111, 116 (2006) (applying NRS 99.0404 in case involving "contractual amount

for which an ascertainable due date exists") (citing *Paradise Homes v. Central Surety*, 437 P.2d

78, 83-84, 84 Nev. 109, 116-17 (1968) (applying NRS 99.0404 in a contract action seeking

money damages where a definite sum of money was due on the date the contract was breached)).

"NRS 99.040(1) states that for cases falling under its purview, interest must be allowed 'upon all money from the time it becomes due.'" *Id.* The Nevada Supreme Court has explained: "[P]rejudgment interest should be calculated for 'all money' owed under the contract from the date it becomes due until the date it is paid or an offer of judgment is made." *Id.*

Here, the money became due when No. 8 Mine/Tackett took possession of the turquoise subject to PA1, on June 19, 2017. Thus, the Eljen Group/Jennings are entitled to recover prejudgment interest from that date through the date of judgment.

Under the statute the rate is that in effect "immediately preceding the date of the transaction." NRS 99.040(1). The transactional date is "the date when the contract was signed." *Kerala Properties, Inc. v. Familian*, 137 P.3d 1146, 1149, 122 Nev. 601, 605 (2006) (citing *Schoepe v. Pacific Silver Corp.*, 893 P.2d 388, 389 n. 1, 111 Nev. 563, 566 n. 1 (1995)). "Under NRS 99.040(1), the interest rate applied is the rate in effect on the date when the parties signed the contract because that is the date when the breaching party incurred obligations to the nonbreaching party." *Id.* Prejudgment interest under NRS 99.040 is calculated at a fixed rate, and the biannual rate adjustment "applies only postjudgment." *Kerala*, 137 P.3d at 1150, 122 Nev. 606.

Here the agreement at issue was signed on June 19, 2017. Therefore, the court looks at the rate in effect on the preceding January 1, which was 3.75 %[7], and adding 2%, the applicable interest rate is 5.75 % per annum. They seek prejudgment interest on the $408,277, which does not account for the trailer's value, likely because they first seek return of the trailer.

---

[7] *See* http://fid.nv.gov/uploadedFiles/fidnvgov/content/Resources/Prime%20Interest%20Rate%20July%201,%202020.pdf, last visited October 26, 2020.

Here the amount of time that has elapsed is 3 years and 129 days, or 3.35 years (June 19, 2017 to October 26, 2020). Taking the 5.75 rate multiplied by the $408,277 amount and by 3.34 years, the total prejudgment interest is $78,409.60.[8]

The Eljen Group/Jennings are also entitled to post-judgment interest at the statutory rate under NRS 17.130(2).

**E. Elkins and Harper-Count XI**

**1. Damages for Breach of the Assignment Agreement**

On June 8, 2017, Elkins, Lente and Harper entered into an assignment agreement whereby they assigned their rights in PA1 and PA2 to No. 8 Mine. The consideration to be paid by No. 8 Mine for the assignment was $1,000,000. (ECF No. 164-3.)

That same day, No. 8 Mine executed a promissory note in the amount of $1,000,000 made payable to Elkins, Lente and Harper, with a maturity date of June 8, 2019. The promissory note gave No. 8 Mine the right to pre-pay. (ECF No. 164-5.)

On June 19, 2017, No. 8 Mine made partial payment to Elkins, Lente and Harper, by three checks totaling $340,000. (ECF No. 107 ¶ 32; ECF No. 112 at 5 ¶ 13; ECF No. 164-6.)

On January 15, 2018, Lente sold his rights in the turquoise to Elkins and Harper. (ECF No. 167-3.)

Elkins and Harper seek damages for breach of the assignment agreement in the amount of $327,667. This is calculated by reducing the $1,000,000 assignment consideration by one-third

---

[8] Their prejudgment interest calculation is only up to time the motion is filed, but they request prejudgment interest up through the date of the judgment, which explains the discrepancy between the amount sought in the motion and the amount awarded.

to reflect the portion of agreement for PA 2 which never matured, to $666,667, and subtracting the $340,000 paid. The balance owed is $326,667. [9]

No. 8 Mine/Tackett provide no argument in connection with the claim for breach of the assignment agreement. There is no dispute that No. 8 Mine/Tackett breached the assignment agreement and promissory note when they failed to pay the remainder due for the assignment of the rights under PA1. Therefore, judgment should be entered in favor of Elkins and Harper and against No. 8 Mine/Tackett on this claim in the amount of $326,667.

**2. Interest**

Elkins and Harper request an award of prejudgment interest through May 15, 2020, in the amount of $30,702.40, plus interest thereafter until judgment at a daily rate of $89.77 per day. This is pursuant to the interest rate of 10% per annum provided in the assignment agreement. The interest runs from the due date of the payment, June 8, 2019.

They also seek post-judgment interest at the contractually agreed upon rate. The promissory note provides that if there is a default in payment, the amount due shall bear interest at the default rate of 10 % per annum. (ECF No. 164-5 at 2.)

Under NRS 99.050(1), "parties may agree for the payment of any rate of interest on money due or to become due on any contract[.]"

They are entitled to recover prejudgment interest from the maturity date of the promissory note of June 8, 2019, until the date of judgment of October 26, 2020, at a rate of

---

[9] Their brief states the amount is $327,667, but by their calculation after reducing the $1,000,000 to account for the PA2 turquoise, to $666,667, and subtracting the $340,000 paid, the amount is $326,667.

1  10%, which is one year and 141 days, or 1.39 years. 10 %  multiplied by the $326,667, and by

2  1.37 years is $44,753.38 in prejudgment interest.[10]

3      Elkins and Harper are also entitled to post-judgment interest at the contractual rate of

4  10% per annum.

5  **F. Declaratory Relief under Count 1**

6      Under the Federal Declaratory Judgment Act, with certain exceptions, "[i]n a case of

7  actual controversy within its jurisdiction, … any court of the United States, upon the filing of an

8  appropriate pleading, may declare the rights and other legal relations of any interested party

9  seeking such a declaration, whether or not further relief is or could be sought. Any such

10 declaration shall have the force and effect of a final judgment or decree[.]" 28 U.S.C. § 2201.

11 "The existence of another adequate remedy does not preclude a declaratory judgment that is

12 otherwise appropriate." Fed. R. Civ. P. 57.

13     There must be an "actual controversy" as opposed to a "dispute of a hypothetical or

14 abstract character." *Company of Hartford v. Haworth*, 300 U.S. 227, 240 (1937). The request

15 must seek "specific relief through a decree of conclusive character, as distinguished from an

16 opinion advising what the law would be upon a hypothetical state of facts." *Id.*

17     Whether to grant declaratory relief is within the trial court's discretion. *See Wilton v.*

18 *Seven Falls Company*, 515 U.S. 277, 288 (1995); *Natural Resources Defense Council, Inc. v.*

19 *E.P.A.*, 966 F.2d 1292, 1299 (9th Cir. 1992) (citation omitted). "The guiding principles are

20 whether a judgment will clarify and settle the legal relations at issue and whether it will afford

21

22

23 [10] Again, the court is awarding them prejudgment interest for the period of time up to the date of judgment, which explains the discrepancy between the amount sought at the time the motion was filed and the amount ultimately awarded.

1  relief from the uncertainty and controversy giving rise to the proceedings." *Natural Resources*

2  *Defense Council*, 966 F.2d at 1299 (citation omitted).

3  Nevada has adopted the Uniform Declaratory Judgments Act, codified at NRS 30.010 to

4  30.160, which similarly gives courts the "power to declare rights, status and other legal relations

5  whether or not further relief is or could be claimed." NRS 30.030. "Any person interested under a

6  … written contract or other writings constituting a contract … may have determined any

7  question of construction or validity arising under the … contract … and obtain a declaration of

8  rights, status or other legal relations thereunder." NRS 30.040(1).

9  "Declaratory relief is available only if: (1) a justiciable controversy exists between

10  persons with adverse interests, (2) the party seeking declaratory relief has a legally protectible

11  interest in the controversy, and (3) the issue is ripe for judicial determination." *County of Clark,*

12  *ex rel. Univ. Med. Ctr. v. Upchurch*, 961 P.2d 754, 756, 114 Nev. 749, 752 (1998) (citing *Knittle*

13  *v. Progressive Casualty Ins. Co.*, 908 P.2d 724, 725, 112 Nev. 8, 10 (1996)). "[W]hether a

14  determination in an action for declaratory judgment is proper is a matter for the district court's

15  discretion and will not be disturbed on appeal unless the district court abused that discretion." *Id.*

16  (citing *El Capitan Club v. Fireman's Fund Ins.*, 506 P.2d 426, 428, 89 Nev. 65, 668 (1973)).

17  Neither the Supreme Court nor the Ninth Circuit appears to have decided whether the

18  Federal Declaratory Judgment Act or relevant state declaratory judgment act applies in a

19  diversity case in federal court. Many district courts to confront the issue have determined that the

20  Federal Declaratory Judge Act applies because it is a procedural statute, and federal courts sitting

21  in diversity apply federal procedural law. *See Cruz v. Select Portfolio Servicing, Inc.*, 10-cv-

22  00283-LHK, 2019 WL 2299857, at *7 (N.D. Cal. May 30, 2019); *757BD LLC v. Nat'l Union*

23  *Fire Ins. Co. of Pittsburgh*, 330 F.Supp.3d 1153, 1159 (D. Ariz.) (citing cases); *Krave Entm't,*

1    *LLC v. Liberty Mut. Ins. Co.*, 667 F.Supp.2d 1232, 1237 (D. Nev. 2009). The court adopts this

2    position.

3           No. 8 Mine/Tackett's only argument is that the claim for declaratory relief is not well

4    pleaded because there is no allegation that the party seeking declaratory relief has a legally

5    protectible interest in the controversy. (ECF No. 168 at 3.)

6           The court disagrees. It is specifically alleged that the Eljen Group/Jennings were the

7    owners of the No. 8 turquoise that is the subject of this litigation, and that any rights to the

8    turquoise reverted to the Eljen parties due to No. 8 Mine/Tackett's failure to pay for the turquoise

9    in full after they took possession.

10          In this motion, the Eljen parties' seek a declaration that No. 8 Mine/Tackett breached the

11   June 16, 2017 purchase agreement, and so No. 8 Mine/Tackett's rights under the June 8, 2017

12   assignment agreement terminated and the Eljen Group/Jennings acted within their rights to

13   withhold delivery of the PA2 turquoise and sell it to Elkins, Harper and Lente. They also seek a

14   declaration that because of No. 8 Mine/Tackett's breach, all rights, if any, with respect to the

15   injunction entered in 3:07-cv-00230-LRH-RAM are null and void, and are vested in the Eljen

16   parties.

17          In its discretion, the court will allow the claim for declaratory relief because it concludes

18   that it will clarify and settle the legal relations at issue and it will afford relief from the

19   uncertainty and controversy giving rise to the proceedings, particularly with respect to any

20   obligations the Eljen parties owed to No. 8 Mine/Tackett after No. 8 Mine/Tackett failed to

21   fulfill their obligations under the agreements. Under the applicable provisions of the Uniform

22   Commercial Code, discussed below, the Eljen Group/Jennings were within their rights to either

23

cancel the agreement or resell the turquoise subject to PA2 when No. 8 Mine/Tackett failed to pay.

"The buyer must pay at the contract rate for any goods accepted." NRS 104.2607(1).

> Where the buyer … fails to make a payment on or before delivery …with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (NRS 104.2612), then also with respect to the whole undelivered balance, the aggrieved seller may:
>
> 1. Withhold delivery of such goods.
>
> …
>
> 4. Resell and recover damages as hereafter provided (NRS 104.2706).
>
> …
>
> 6. Cancel.

NRS 104.2703

If a seller selects resale as a remedy, "the seller may resell the goods concerned or the undelivered balance thereof." NRS 104.2706(1).

Thus, the Eljen Group/Jennings were within their rights to pursue any of these remedies when No. 8 Mine/Tackett failed to pay the agreed upon price after taking possession of the PA1 turquoise. Specifically, it was legally permissible for them to cancel the agreement or to withhold the remainder of the turquoise (the PA2 turquoise) and re-sell it.

Insofar as the rights under the injunction in 3:07-cv-00230-LRH-RAM are concerned, the agreement produced by No. 8 Mine/Tackett in discovery states that the agreement was for the purchase of approximately 250,000 pounds of turquoise "Stones," for $1.5 million. The agreement goes on to state that if the purchaser (No. 8 Mine) "purchases the Stones" then the seller (the Eljen Group/Jennings) agrees to assign, transfer, and convey any and all rights arising

1   under the litigation  in 3:07-cv-00230-LRH-RAM, including all rights under the permanent

2   injunction dated June 23, 2009. (ECF No. 164-4.) Therefore, completing the purchase of the

3   turquoise was a precondition to the obligation of the Eljen Group/Jennings to assign, transfer or

4   convey rights arising under the litigation in 3:07-cv-00230-LRH-RAM. Since No. 8

5   Mine/Tackett did not complete the purchase as contemplated, the Eljen Group/Jennings were not

6   obligated to assign, transfer or convey their rights in the 3:07-cv-00230-LRH-RAM litigation,

7   and any rights that arose from that litigation remain with the Eljen Group/Jennings.

8        In sum, the court finds that the Eljen Group/Jennings are entitled to declaratory relief

9   reflecting these findings.

10  **G. Preliminary Injunction**

11       On August 8, 2019, the court entered a stipulated preliminary injunction ordering that

12  No. 8 Mine, Tackett, the Eljen Group, Jennings, Elkins, Lente, Harper, Daniel Harrington,

13  Pamella Harrington, and the Harringtons' company, Nightwatch marine, LLC, not dispossess any

14  of the No. 8 turquoise or silver bars in dispute in the two cases until further order of the court.

15  This was defined to include: the Number 8 turquoise that was the subject of PA1; the No. 8

16  turquoise that was the subject of PA2; the turquoise received by Tackett from the Harringtons;

17  any turquoise in the possession of the Harringtons or Nightwatch Marine; the turquoise acquired

18  by No. 8 Mine/Tackett from Paul Sugar, Sr. and/or Paul Sugar, Jr.; and any silver bars delivered

19  by Argent Asset Group, LLC, whether directly or indirectly, on or after July 13, 2017, except

20  that the injunction did not apply to silver bars of a value of $50,000 or less in the possession of

21  Jennings to allow for use for personal expenses. (ECF No. 105.)

22       The Eljen parties seek partial release of the preliminary injunction. They ask the court to

23  terminate the injunction with respect to the Eljen parties only, but continue the injunction with

1   respect to No. 8 Mine and Tackett until the earlier of a further order of the court or satisfaction of

2   any judgment against them. They also request that the court retain jurisdiction to enforce any

3   violations of the preliminary injunction by No. 8 Mine and Tackett.

4        No. 8 Mine/Tackett do not address this request.

5        A preliminary injunction "remains in effect until a final judgment is rendered or the

6   complaint is dismissed, unless it expires earlier by its own terms, or is modified, stayed, or

7   reversed." 11A Wright, Miller & Kane, *Federal Practice and Procedure* § 2947 (3d ed.). As the

8   Ninth Circuit has stated, "[a] preliminary injunction imposed according to the procedures

9   outlined in Federal Rule of Civil procedure 65 dissolves *ipso facto* when a final judgment is

10  entered in the cause." *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1093 (9th Cir. 2010)

11  (citations omitted). "This principle stems from the very purpose of a preliminary injunction,

12  which is to preserve the status quo and the rights of the parties until a final judgment issues in the

13  cause." *Id.* (citations omitted).

14       Therefore, to the extent the Eljen parties ask that the preliminary injunction continue in

15  effect beyond the entry of judgment as to No. 8 Mine and Tackett, the request is denied, as the

16  preliminary injunction terminates upon the entry of judgment. As the Ninth Circuit pointed out in

17  *U.S. Philips Corp.*, this does not affect the Eljen parties' "continuing ability to seek damages,

18  through contempt proceedings, for any violations of the … preliminary injunction that may have

19  occurred while [the preliminary injunction was] in effect." *Id.* a 1095 n. 3.  The court will retain

20  jurisdiction to entertain any such motion.

21       The court notes that the Eljen parties did not request a permanent injunction. *See eBay*

22  *Inc. v. Mercexchange, LLC*, 547 U.S. 388, 391 (2006) (setting forth four-factor test for

23

1 permanent injunctive relief). Nor have the Eljen parties set specifically requested, or set forth

2 legally authority, for some type of post-judgment injunctive relief.

3       The Eljen parties also ask the court to authorize them to place locks and security cameras

4 on the storage units of No. 8 Mine/Tackett wherever they have stored No. 8 turquoise to prevent

5 further dispossession of the turquoise pending further order of the court or satisfaction of the

6 judgment. They provide no legal authority for this request; therefore, this request is also denied.

7 <center>**III. CONCLUSION**</center>

8       The court finds that Tackett is the alter ego of No. 8 Mine.

9       The Clerk shall enter judgment in favor of the Eljen Group/Jennings and against No. 8

10 Mine/Tackett on the claims for unjust enrichment, fraud, conversion, breach of the promise to

11 deliver silver (Counts II, III, VI, and VIII) in the amount of $408,277, plus either the return of

12 the trailer or payment of its value of $11,000.

13       The Eljen Group/Jennings are entitled to prejudgment interest in the amount of

14 $78,409.60, and post-judgment interest at the statutory rate under NRS 17.130(2).

15       The Clerk shall enter judgment in favor of Jennings and against No. 8 Mine/Tackett in

16 the amount of $419,277 on the elder abuse claim in Count VI.

17       The Clerk shall enter judgment in favor of Elkins and Harper and against No. 8

18 Mine/Tackett in the amount of $326,667, for the breach of assignment agreement claim in Count

19 IX.

20       Elkins and Harper are entitled to an award of prejudgment interest at the contractual rate

21 of 10 percent per annum for a total of $44,753.38, as well as post-judgment interest at the

22 contractual rate of 10 percent per annum.

23

1   The Eljen Group/Jennings are entitled to a declaration that they were within their rights to

2   either cancel the agreement, and/or withhold and re-sell the PA2 turquoise when No. 8

3   Mine/Tackett failed to pay for the turquoise.

4   The Eljen Group/Jennings are entitled to a declaration that No. 8 Mine/Tackett did not

5   complete the purchase of the turquoise, which was a precondition to the obligation of the Eljen

6   Group/Jennings to assign, transfer, or convey rights arising under the litigation in 3:07-cv-00230-

7   LRH-RAM; therefore, any rights arising from the 3:07-cv-00230-LRH-RAM litigation remain

8   with the Eljen Group/Jennings.

9   The Eljen parties' request that the preliminary injunction remain in effect as to No. 8

10  Mine and Tackett is denied. The court will, however, retain jurisdiction to entertain any motions

11  that a party or person acting in concert with a party with knowledge of the injunction violated the

12  terms of the preliminary injunction while it was in place.

13  The Eljen parties' request that the court authorize them to place locks and cameras on

14  No. 8 Mine/Tackett's facilities that store No. 8 turquoise is likewise denied.

15  The Eljen parties elected to not proceed to judgment on Count IV, Count V, or Count X;

16  therefore, those claims are dismissed with prejudice.

17  **IT IS SO ORDERED**.

18  Dated: October 26, 2020

19  _____
    William G. Cobb
20  United States Magistrate Judge

21

22

23